ANNA R. ANDREW et al., Appellants, v. MARY A. LINEBAUGH et al.

Division One, July 14, 1914.

1. **ABSTRACT:** Additional By Respondent: Taken as True. An additional abstract of the record brought up by respondent, in nowise challenged by appellant's counsel, under the rules of the court will be taken as true.

2. **WILL CONTEST:** Case for Jury. Where there is substantial evidence to support the issue of testamentary incapacity and undue influence in a will contest, the case is one for the jury; and in such case, a verdict for proponents will not be set aside on the ground that it is against the weight of the testimony, but only for errors in giving or refusing instructions or in admitting or excluding evidence.

3. ———: Evidence: Unfriendly Feeling Toward Proponents. Evidence of hostile or unfriendly feeling by testator towards proponents of the will, offered by contestants, is not competent to establish undue influence or testamentary incapacity.

4. ———: ———: **Not Excluded.** Where the record shows that certain testimony offered by appellants was not in fact excluded, but was simply not offered when the trial judge suggested it might be incompetent and advised that it be not offered, expressing, however, a willingness to admit it if counsel insisted, it cannot be held that error was committed.

5. ———: ———: **Refusing to Contest: Because of an Offer of Money.** It is not error to exclude testimony tending to show that certain legatees discriminated against by the will, have taken no part in contesting it because they have been offered stated sums of money not to join in the contest, where the offer was in the nature of a compromise of the case, and not as an attempt to bribe the legatees.

6. ———: **Numerous Instructions.** The number and length of instructions given must largely depend upon the character of the case, the number of issues involved and the collateral matters injected into the trial. And when all given are read in the light of the facts of the case and it cannot be discerned that they were misleading, confusing, one-sided, unfair or prejudicial, but were clear and terse directions upon the issues involved, they will not be held to be error, even though voluminous.

7. ———: **Instruction: General Complaint.** It is the duty of appellant's counsel to point out the particular error in the instructions of which complaint is made. If only a general complaint is made (such as they are misleading, confusing, one-sided, unfair and prejudicial) counsel who, though familiar with the issues and the mass of evidence, have failed to discover particular errors, should not complain if the appellate court fails to discover them.

8. ———: ———: **Objectionable Words Must be Considered with Context.** A certain clause in an instruction cannot be held to be erroneous unless it is so after reading it in connection with the balance of the instruction of which it forms a part, the other instructions given, and the facts of the case. Where testator gave small bequests to contestants, and large ones to other heirs less deserving, an instruction which told the jury that unless they found from the evidence that testator was unduly influenced or coerced as those terms are elsewhere defined, or was mentally incompetent to make a will, then you "have no right to inquire into or speculate upon the motives which caused him to dispose of his property as set forth in the will," was not erroneous, since, even if the words quoted, considered alone, may be considered an abstract proposition of law, they are not so when considered with their context,

the facts, and the other instructions, which told the jury
that all apparent unnatural discrimination in the disposition
of his property should be considered by them in passing upon
testator's testamentary capacity. .And at their worst they
were harmless; and if viewed as an unwarranted comment
on the evidence, that objection was not advanced in the trial
court, nor has it been on appeal.

9. ———: ———: **Evidence Contradicting Statements** of
**Proponents: As Affecting Credibility.** It is not error to in-
struct the jury in a will contest, that testimony of certain
witnesses tending to contradict testimony of testator's wife
and the chief beneficiary of the will as to testator's uncon-
trolled emotions and the manual gift of certain property, is
not to be considered as any evidence of the testator's mental
condition, or of undue influence, but only for the purpose of
contradicting said wife and beneficiary.

10. ———: **Testamentary Capacity.** One has a disposing mind
and memory when he is capable of comprehending the
character, nature and extent of his property, all the persons
and names of the persons who naturally come within the
range of his bounty, and the disposition he is making of his
property. And tested by that rule, the three instructions set
out in the opinion, one for proponents, one for contestants,
and one of contestants' as modified by the court, are held
not to be conflicting.

11. ———: ———: **Refused: Undue Influence: No Evidence.**
An instruction .telling the jury that, in .order to find undue
influence, it is not necessary to find that overt and open acts
of undue influence were exercised at the very time of the
execution of the will, but it is sufficient to ·find that such
influence had been previously acquired and did operate at the
time of making ' the will in the disposition of the property,
correctly states an abstract proposition of law, but it is not
error to refuse .it where there is no evidence of previously
acquired and exercised undue influence.

12. ———: ———: **Undue Influence of Wife.** Influence which
a wife may acquire over her husband by her general demeanor
and conduct towards him, as his wife, through associations
with him, even though it result in so gaining his affections
and confidence as to create a desire on his part to favor her
in his will to the exclusion of his children or grandchildren,
or to favor some of them to the exclusion of others, is not
undue influence.

260 Mo.—40

13. ———: **Inequality: Instruction.** Inequalities in the devises and bequests given to testator's children are proper matters of proof and of comment in argument of the case to the jury, but an instruction telling the jury that they may consider such inequalities as facts tending to throw light upon the question of testator's soundness of mind or undue influence, should not be given, since such an instruction would be a comment on the evidence and therefore tend to give undue prominence to such inequalities.

Appeal from Nodaway Circuit Court.—*Hon. William C. Ellison,* Judge.

AFFIRMED.

*Cook, Cummins & Dawson* for appellants.

(1) Contestants should have been permitted to show the state of testator's feelings toward his son Francis. There is possibly no thought in determining the validity of any will that is more potent than the feelings which a testator may have had for his offspring. That thought has perhaps been contained in the instructions of every will case coming before the court. The views of the trial court were that the testator's affections for any one of his offspring who is not contesting the will were immaterial; and that whether he hated or disliked the ones who are wanting to sustain the will, is likewise immaterial. The court refused to permit us to show the state of testator's feelings for Francis, as he was not contesting the will. In this case, as in all others, the jury has been told that the testator's affections for the different members of his family, and the natural objects of his bounty, is a proper subject for them to consider. That being true, what difference could it make whether these members of the family or objects of his bounty were sustaining or fighting the will? Could

it be said that if perchance a disliked or wayward child had received an estate to the detriment of one beloved and respected, a jury were not entitled to know that fact, and consider it in determining the "soundness of mind" of the one who had made such a will? In this cause Francis was the second child of the deceased, and was with him at the time the foundation of this fortune was laid. He was the father of the plaintiff Anna Andrew, and we say that we ought to have been permitted to show the relations and feelings that existed between this son and his father, as it might tend to throw light on the mental capacity of Mr. Linebaugh at the time he made a will, disinheriting the grandchild, Anna. Mowry v. Norman, 223 Mo. 471. (2) It will be remembered that the will was left by Rogers with Mr. Linebaugh, unsealed. The facts stated in an offer of proof will be considered by the appellate court as proved. Leicher v. Keeney, 98 Mo. App. 394. On the trial Mrs. Linebaugh and Jeff appeared as witnesses. Julia and Etta are shown in the record to have been present with the mother. Julia is shown to have likely had more information concerning her father than any other person mentioned in this cause. The contestants offered to prove by the mother that after Mr. Linebaugh died these four people, the mother and three children, Jeff, Etta and Julia, had a meeting at the Linebaugh home before they brought the will to be probated; that in that conference Julia was determined to contest the will and that to keep her from doing so, and to keep her on their side of the case, the other three agreed that she should be paid $6000 out of the personal property belonging to the estate. The court refused this offer. The four principal beneficiaries of the will have it unsealed in their possession before it is brought to probate. One of these was determined to contest the will. She was the one who had acted as the clerk of the father and

was therefore familiar with his business and its conduct. She is shown to have been with him on a great many occasions during the last summer of his life in his home, and driving him about the country. Unquestionably a powerful witness, and these facts the other three knew. They didn't want her to appear against this will, and were determined that she should not do so, but she likewise was determined the other way. They saw the danger if they permitted this woman to join in a contest of the will, and so they hired her not to do it, contracting to pay her $6000 if she would help them and not help their adversaries. Julia appeared at the trial, earning her money, for in the testimony of the mother she is spoken of as "this daughter by my side." She doesn't testify, in all probability because of the fear that her wrong doing would be exposed. It is a most striking example of moral bribery (if not legal), and we say that the jury ought to have been permitted to know that it had occurred. It would not only reflect on the credibility of the two conspirators who testified at the trial, but would have let the jury know why Julia appeared at the side of the mother, supporting the cause of Jeff and fighting through the power of her influence the cause of these plaintiffs. Not only that, but unquestionably these plaintiffs because of this bribery were deprived of the assistance of the one who in fact knew the truth as to the condition of her father. If the time has come that adversaries may be lined up in court at the rate of $6000 a head, then trials become a farce. (3) The instructions given to the jury for proponents are misleading, voluminous and confusing; and taken as a whole are one-sided, unfair and prejudicial. The instructions given for proponents form a charge of about 2500 words. They are nineteen in number and fill about eleven pages of well printed matter in the record, containing numerous repetitions and giving undue prominence to propo-

nents' side of the case. Heman v. Hartman, 189 Mo. 24; Sidway v. Stock Co., 163 Mo. 376; Dakan v. Chase, 197 Mo. 238; Endger v. Kupper, 110 Mo. App. 288. (4) It was error to refuse plaintiff's instruction number 7. This instruction fairly and concisely states the law. Mowry v. Norman, 204 Mo. 193. The trial court finds no fault with any part of it, yet refused to give it as asked, but added to it fifteen lines, presenting a matter wholly foreign to the subject-matter of the instruction, and which had been given before in instructions for the proponents. (5) Plaintiffs' refused instruction number 1 should have been given. It is in this form: "The court instructs the jury that if you believe from the evidence that the deceased Linebaugh signed the paper in controversy and in evidence without having read the same, and without being fully advised and informed as to the entire contents thereof, then such paper would not be a will, and in such case your verdict should be against the proposed will regardless of any other fact or circumstance in the case." The propriety and necessity of an instruction of this character are abundantly disclosed in the record. It is true the witness Rogers testifies that he read the will to Mr. Linebaugh, paragraph after paragraph, as each one was written, and that when he had finished the writing he again read the whole will to him. On the contrary, Mr. Souers testified that he was there between twenty and thirty minutes before Mr. Wallace came, and Mr. Wallace testified that he was there three or four minutes before Rogers finished the writing. Both of these witnesses testified that during the entire time they were there Rogers was writing on the will, and that when he finished he did not in any manner inform Mr. Linebaugh what he had written during that time. It thus becomes conclusive that when Mr. Linebaugh signed the will he did not know a single word that had been written in it, for at least one-half hour, with Rogers

writing industriously all the time. As to the rapidity with which he wrote he testified that he could write and probably did write, the entire attestation clause in three minutes. This attestation clause was shown to have contained six lines and four words. This becomes tremendously important, because at that rate he could write that entire portion of the will that disinherited these plaintiffs. Therefore, if Souer's testimony may be believed, even though Rogers swears it is not true, then the portion of the will affecting the plaintiffs was not read to deceased before he signed it; he was not told what had been written and it is admitted that he didn't read it himself. Carlson v. Lafgran, 250 Mo. 527; Bradford v. Blossom, 207 Mo. 177; 40 Cyc. 110. It is true that the authorities hold that where a testator gives directions as to what he wants written in a will, and the writer in fact follows those directions, then it is not necessary that it be read to him after the writing is finished. But that has no application to this case. Rogers testified "He then came to the Burch heirs, and in writing that clause I used the very words that Mr. Linebaugh dictated to me. That whole clause is his dictation and identical words." Now, the clause concerning the Burch heirs is at the very last of the will, and Souers testified that no dictation was done during the last half hour that Rogers wrote, and what was written during that time was not read to Mr. Linebaugh, nor did he read it, and it was not explained to him. This made a question for the jury, which should have been submitted under this refused instruction.

*J. W. Peery* and *Shinebarger, Blagg & Ellison* for respondents.

(1) If a plaintiff who appeals has no case under the evidence, then, however many errors against him may have been committed by the trial court, the judg-

ment will not be reversed, if that point is raised by the respondent. Trainer v. Mining Co., 243 Mo. 370; Barclay v. Cemetery Ass'n, 153 Mo. 300; Fritz v. Railroad, 243 Mo. 68; Burns v. City, 131 Mo. 378; State ex rel. v. Jones, 131 Mo. 204; Von Develd v. Judy, 143 Mo. 367. (2) In the execution of the will every formality of the Statute of Wills was complied with. (3) Contrary to appellants' assertion, the provisions of the will in the circumstances revealed by the record, are neither unnatural nor unreasonable, nor unusual; and in the absence of other evidence of undue influence exerted *male fide,* its discriminations will not be considered as any evidence whatever of such influence. Hayes v. Hayes, 242 Mo. 169; Winn v. Grier, 217 Mo. 549; Hughes v. Rader, 183 Mo. 709; McFadin v. Catron, 138 Mo. 225; Carter v. Dilly, 167 Mo. 567; Weston v. Hanson, 212 Mo. 248. (4) The petition limits the charge of undue influence to testator's wife and only son. There is no competent (or, for that matter, incompetent) evidence in the record tending to show that either of them ever exerted any influence over the mind of the testator to induce him to make this or any other will; and in this connection we contend that: (a) What witnesses said the testator had said is incompetent evidence to establish undue influence. Teckenbrock v. McLaughlin, 209 Mo. 547; Schierbaum v. Schemme, 157 Mo. 16; Siebert v. Hatcher, 25 Mo. 101; Crowson v. Crowson, 172 Mo. 703; Weber v. Stroble, 236 Mo. 603; McFadin v. Catron, 120 Mo. 274; Hayes v. Hayes, 242 Mo. 155. (b) What witnesses said that either of the respondents had said while not in the hearing of the other beneficiaries, is incompetent evidence on either the issue of undue influence or testamentary incapacity, unless a conspiracy is charged, which is not the case here. Schierbaum v. Schemme, 157 Mo. 17; Teckenbrock v. McLaughlin, 209 Mo. 541; Wood v. Carpenter, 166 Mo. 485; Siebert v. Hatcher, 205 Mo. 101; King v. Gilson,

191 Mo. 332. . (c) What the witnesses say that the testator said that somebody else said is wholly incompetent because it is hearsay evidence of the rankest sort. (5) The evidence shows clearly that the testator was of sound and disposing mind when the will was made. (6) No error was committed against appellants by the trial court in its rulings on the admission and rejection of proffered testimony, but the trial court repeatedly committed error in appellants' favor by overruling respondents' objections to the introduction of evidence offered by appellants. (7) No fraud or imposition was practiced on the testator by the scrivener. The petition does not tender. such an issue, and there is no evidence to support it if it did. (8) Every instruction given by appellants was that much more than they were entitled to under the evidence, and respondents' instructions properly declared the law as applied to the facts in this case.

WOODSON, P. J.—The plaintiffs brought this suit in the circuit court of Nodaway county to contest the validity of the will of their deceased grandfather, Jacob Linebaugh. The plaintiffs are the children of two of the testators' deceased children, and the defendants are his widow and his three living children.

The alleged grounds of the contest are, that the testator, at the time of making and publishing the will, was mentally incapable and had undue influence exercised over his enfeebled mind by the defendants.

A trial was had before the court and jury, which resulted in a judgment sustaining the will, and the plaintiffs duly appealed the cause to this court.

I will first state the undisputed facts of the case, and then the substance of the evidence introduced by counsel for plaintiffs; and thereafter such evidence as tends to contradict the case made for the latter.

The testator, as I gather it, was of foreign birth, but came to this country when quite young, first lo-

cating in the State of Iowa, and in 1859 moving across the State line into Nodaway county, Missouri, and there lived until 1910, when he died, at the advanced age of eighty-two years.

The testator left surviving him, his widow, Mary A. Linebaugh, a son, William J. Linebaugh, commonly called Jeff, and two daughters, Julia Farrens and Etta Hulse. The son William and the daughter Etta have children, but Julia was childless.

In addition to the above named, the testator left eight grandchildren; seven of whom were the children of his deceased daughter, Sarah Jane Burch, who died June 14, 1910, a few months prior to his own death; and the other was Anna R. Andrew, the only child of a son, Francis Linebaugh, who departed this life twenty-odd years prior to the death of the testator.

The estate of the testator was worth about $300,000; consisting of about eighteen hundred acres of Nodaway county land (the next to the best on earth), a hotel building in Clearmont, and about $75,000 worth of personal property of various kinds.

The will was executed September 1, 1910, about a month and a half before the testator's death. He thereby disposed of his property substantially as follows:

1st. He gave to his widow about nine hundred acres of land and practically all of the personal property for life, with remainder to his son William J. and his daughters Julia and Etta in fee.

2nd. To William J. about five hundred acres of land for life, with the remainder therein to his son William W. in fee.

3rd. To his daughter Julia, about two hundred acres of land for life, with the remainder to her children in fee.

4th. To his daughter Etta, about two hundred acres of land for life, with the remainder in fee to her children.

5th. To each of his said eight grandchildren the sum of $500, after the settlement of his estate.

The widow was duly named the executrix by the will of the testator.

The testator had but little education, though endowed with fine sense and splendid business capacity, as well as a strong mind and a vigorous constitution.

The testator's life was assiduously devoted to farming and stock raising, and by strict economy and frugality he accumulated the estate previously mentioned. His business activities continued down to about two years prior to his death, without the assistance of an agent or counsel, save, perhaps, one of his daughters at times did some clerical work for him.

His business called him frequently to all parts of the community in which he lived, and for years he was well known by everyone in that vicinity, and was by them called "Uncle Jake." His business transactions ran into the hundred every year, and involved many thousands of dollars. All of the witnesses spoke of him as a good man that tried to live right and to do no wrong. That he was a devoted husband, a loving father and grandfather, and was on good terms with all of his children and grandchildren. (A great life.)

The plaintiffs' evidence further tended to show: That Francis Linebaugh, the son who died about twenty-two years before the testator departed this life, left surviving him a daughter, Mrs. Anna R. Andrew, one of the plaintiffs in this case, about eight years of age; that about the same time the child's mother also died, and thereupon the testator took the child, Anna, into his own home and reared her as one of his own children, where she remained until she

was married to Andrew, at the age of nineteen. She lived and worked in the home of the testator and was treated by him as he treated his own children— he was very fond of and was greatly attached to her. She was equally strongly attached to him, and was strongly devoted to him. The testator often spoke to her regarding her father and how much he loved him and her, and frequently told her that she should have her father's share of his estate. Even after her marriage, when the work was heavy on the farm of the testator, she frequently went to his home and assisted them in doing the work; and during his last sickness she was almost constantly with him and looked after his every want, and up to the last when he wanted anything he always called upon Anna to do it for him.

That Anna has four children, and owned the remainder in twenty acres of land in which Mr. Linebaugh owned a life estate.

That apparently Etta and Julia took no interest in the contest of the will, neither of them testifying; and the plaintiffs offered to prove that Julia, as a matter of fact, was not in favor of the will, but because of an agreement made between her, her mother, brother and sister, by which she is to receive $6000 from her mother, she took no part in the case. This evidence upon objection of counsel for defendants was excluded and counsel duly excepted.

That each of these daughters owned a farm of their own. The testator, shortly before his death, deeded to each of them eighty acres of land. This was in addition to what he gave them under the will.

That William J. Linebaugh, who under the will got the greatest interest in the estate, was forty-five years of age, and at the date of the trial had been married about twenty-five years. That he was lazy, indolent and did not make a living for himself and family, but was, in effect, a drone, living off the labor

of his father. That for years his father allowed him to occupy one hundred and sixty acres of his land, and later increased it to three hundred acres, free of rent, and the father paid all the taxes thereon. That even with this small assistance William was not able to make a living, but frequently called upon the testator for additional assistance to keep the wolf from his door, which the father, from time to time, granted; amounting in all to about $1000 a year. That this was all in addition to what he and his children got under the will—the lion's share.

That the testator never received from the son any service of consequence for these valuable favors, nor did the son manifest any great affection for or deep attachment to the father until and during the last two years of his life—during which time he was sick and unable to transact his business in the ordinary way. That during those two years William was his almost constant companion and attendant, and according to his own testimony he visited him frequently at his home, drove him about the country, took him to town and accompanied him to sales; and upon some of those occasions discussed business matters with him; but says that he never transacted any business for him whatever—nor discussed with him the will or any of its provisions.

That William Linebaugh, Jr., was also passive regarding the will contest—seeming to be satisfied with the will as executed. Jefferson Rogers, the draftsman of the will, stated that he resided in the immediate vicinity of William, Jr., and had known him all his life, but did not know his business or occupation.

That Sarah Jane Burch, the oldest of the testator's children, and the mother of the seven Burch plaintiffs, and that Anna Andrew, the other plaintiff, when girls, worked upon the farm of the testator, doing the ordinary work of men in so far as their

strength would permit—"worked in the fields, set posts," etc.

That about twenty-five years prior to the trial of this case, Sarah Jane married Joseph Burch, and moved to Kansas, where they lived for several years, at the end of which time she received a letter from her father, the testator, telling her to return home, which she did. Shortly thereafter, he purchased for her one hundred and forty acres of land, referred to in this record as the "Burch Farm," and placed her and her children upon it—verbally giving it to her at the time—her husband, if I correctly understand the record, did not return with her, she, about that time, 1902, having separated from him. That out of this transaction grew a suit by Joseph Burch, her husband, against her father, the testator, for a large sum of money, damages for the alienation of her affections from him, as his wife. This suit was subsequently compromised and settled by the defendant paying the plaintiff the sum of $——. That lawsuit so imbittered the testator, the defendant in that case, against Joseph Burch, the plaintiff therein, and the husband of the testator's daughter, that in order to cut out all of Joseph Burch's marital rights in and to the farm he had previously given to Sarah Jane, he required her, by quitclaim deed, to convey to him all rights, title and interest, if any, she had in and to the "Burch Farm."

Shortly after this Mrs. Burch was divorced from her husband, Joseph Burch, and thereupon her father again gave the same farm to her and her children, as he had done before, orally declaring that it belonged to her and her children; and she in pursuance thereof remained in possession thereof down to the date of her death, June 14, 1910.

Some two years after the divorce had been granted, against the strong opposition of her father, Mrs. Burch again married, or remarried, Joseph

Burch, her former husband. There was some evidence tending to show that Mrs. Burch prior to her remarriage to Joseph, went to her father and consulted him regarding the wisdom thereof, and that after hearing her he said in effect, to do as she pleased, as her happiness alone should be considered.

About two years prior to the death of Mrs. Burch, she became afflicted with consumption and went to California in hope of relief; but receiving no benefit thereby she returned home, and as previously stated, died June 14, 1910. Her father, the testator, during the last few months of her last illness, went to see her quite frequently and manifested very tender regards for her on account of her sickness, and showed in many ways that he loved her very tenderly, probably as much, if not more, than any other of his children.

All of Mrs. Burch's children were intelligent, respectable people, being farmers or the wives of farmers, living in the neighborhood upon rented lands, with probably one exception—Jacob living upon his own farm. At all times they enjoyed the confidence, respect and esteem of their grandfather, the testator, and their relations with him had always been most cordial. He gave them nothing outside of the $500 each, mentioned in the will.

That Mary Ann Linebaugh, the widow of the testator, was seventy-eight years of age at time of the death of her husband. She, like her husband, possessed but little education, having gone to school only three months, and if she could write she never did, so far as this record shows. She scarcely ever went out, cared nothing for society, and but few of her neighbors knew her. She was a woman of strong mind, great determination and high temper, economical and saving.

Joseph Burch, the husband of testator's daughter, was given one dollar by the will, presumably to show he had not been forgotten in the last days.

Several years prior to the year 1910, the testator had made a previous will to the one in controversy, giving each of his children or their descendants equal parts of his estate, and had repeatedly so stated to his neighbors, and that he was determined that his daughters should have equal shares . with his sons therein. He also stated to several, and among others, to his brother Isaiah Linebaugh, that he was going to charge up against his son William all the money he had let him have as an advancement against his interest in his estate, and assigned as a reason therefor that he did not want to take it from the other children and give it all to William. He told others that he thought that it would be morally wrong not to give his children or their descendants equal parts of his estate. The record shows that at the time of executing the first will and making the statements just referred to, Mr. Linebaugh was a strong, active and vigorous man, a splendid type of mental and physical manhood.

That in the latter part of the year 1908 and early part of 1909 the health of the testator was destroyed; that he was a physical wreck, having undergone a great change in appearance, an "old, broken down man." That he had an attack of grip which left him in bad condition, one lung badly diseased. He had lost one eye and his hearing had been considerably impaired. That during this time he complained of rheumatism throughout his system and had some affection of the throat; also a complication of kidney and bladder troubles affecting his nervous system generally. He frequently complained of pains in his head and back, and had, according to one witness, "blind staggers," and finally died of a complication of diseases.

For the purpose of showing the mental condition of the testator during the last two years of his earthly existence, plaintiffs introduced evidence tending to show that he had a debt secured by a mortgage on the Baptist Church of Clearmont, and he demanded payment of the same. That the officers of the church asked him to "help a little in paying the debt." That in reply he stated that he had always tried to live right and had about lived out his days, and that while he would like to help them, he could not so do, and broke down and cried, and for that reason they changed the subject and departed.

That he would sit alone on his porch with head hanging down, lamenting his condition, and that most of his children were girls, and that consequently his property would pass from the Linebaugh name.

That in January, 1910, he promised to loan one Davidson, a neighbor, whom he had known intimately for thirty years, the sum of $2000—with ample security; that at the appointed time Davidson went to the house of the testator to procure the money, and upon stating his mission, the testator did not know him or remember the agreement regarding the proposed loan, but finally said, "I do remember something about you being here, I believe, but I don't remember anything about a loan."

William Gillespie testified that he had lived within two miles of the testator for thirty-five years, and had known him intimately for that time and had worked for him. He met Mr. Linebaugh at about the time the will was written. Mr. Gillespie says: "I went up to him and spoke to him and he looked at me and said, 'I don't know who you are.'"

Alma Humphrey, one of his grandchildren, testified that she met the testator on the streets of Clearmont and said to him, "How do you do, grandfather?" and shook hands with him, and he said, "Who is it?" She said, "It is Alma," and he replied, "Oh, yes, Alma:

how are you?" Also that he had known her all her
life and she was then and had been living on a part
of his farm.

William Carpenter testified that the testator
stepped into his store one day and bought a piece of
farm machinery of the witness and took it away with
him. In an hour he returned and wanted to buy
another. That he tried to call his attention to the fact
that he had purchased the one an hour ago. Mr. Car-
penter says, "I told him that he had bought one
awhile ago, and he said he didn't think he had, but
that if he had he would bring this last one back. He
took one the second time, and later in the day brought
one of them back."

That in April, 1910, a lamp exploded in the
house of the testator, and set fire to the same,
somewhat damaging the room. The testator as-
sisted his wife and one Lasley in extinguishing the
fire. It is described as an exciting time, starting with
the scream of the wife, "I'll burn up." Mr. Line-
baugh while on his knees fighting the fire with his
hands, with the flames and smoke all about the room,
became exhausted and was "worn out," and after it
was all over a piece of heated glass was found to have
burned its way into his foot, although he didn't know
it at the time. The evidences of the fire were not re-
moved from the room until July. That for months
after, he, in a nervous and excited manner, told and
retold the whole story, many times to the same person,
oftentimes illustrating and exhibiting his own actions
and conduct while the fire progressed.

That in the meantime Mrs. Burch, afflicted with
consumption, returned from California, and Mr.
Linebaugh began visiting her, declaring that it was
never too stormy for him to go and see her, Janie.

He sat by her bedside and with tears in his eyes talked to her of the olden times, and she would sing to him—songs which she had sung in childhood.

That they discussed with each the fact that with them the end was not far away, and she showed him her burial shroud; and that he talked with her of Jeff, William J., and told her that Jeff's notes would be charged against his interest in the estate. That he laid in her hand a twenty-dollar gold piece and she asked him if he would charge that against her interest, and he replied, "No, Janie; I give that to you."

That they talked of her children and she asked what will become of them, and he said to her, "I will take care of them," also. He also talked with her about her interest in his estate and said that her old home farm, the one she had deeded to him some time previously, should go to her children as a part of her interest.

That upon one of those visits he complained to her that she did not look natural, and she suggested that it was because she did not have on her curls; and then she had the nurse to get her curls and put them on her, and then, patting her on the cheek, he said, "Now you look like my Janie."

That on the day before her death, while visiting her, he fainted and was carried unconscious from the sick room. After a while he was revived and removed to the yard. In the evening he insisted on seeing her again and was permitted to do so, bade her goodby, and was taken away, and saw her no more.

Three weeks later Anna found him alone in a room of his home standing in front of a picture of Mrs. Burch, crying and seemed to be talking to the picture. She led him away and seated him on the porch. Within a month after this occurrence he made the will in question.

After the day of the fire, in April, he never drove alone, save on the one occasion when he saw Rogers about writing the will.

A few days before the will was made he gave a list of his property to the assessor and swore that it was true. In that list he swore that all the money and notes that he owned amounted to $18,975. The evidence showed that at that time he owned $68,748.79.

That in May, 1910, the daughter Etta secured from the testator a deed for eighty acres of land, worth $6400.

That William J., the son of the testator, received about $11,000 worth of notes from the latter he had given him for money borrowed, and burned them. (These notes, as I understand the evidence, represented a part, if not all, of the money the son had borrowed from the father from year to year, and which plaintiffs claim was intended as an advancement.)

There is no question but what the testator delivered the notes to William J., the son, and that the latter burned them, and has never accounted for them or any part thereof, upon the theory, as defendants' evidence tended to show, that the father gave them to the son before the death of the former. Yet the plaintiffs claim that the mother and not the father, the testator, gave him the notes; but there is no substantial evidence tending to support this contention.

Eugene Lasley testified that shortly before the death of the testator he asked him why he did not buy Anna Andrew's old place and deed it back to her? That instead of answering the question his wife in his presence and hearing said "that Andrew had squandered enough of their hard labor, and she didn't propose for him to squander any more of it;" and that the testator made no reply.

That about this time, when the cattle of said Humphrey were being pastured on the farm of the

testator, his wife, Mrs. Linebaugh, had compelled and insisted that the testator have them removed. That in order to avoid trouble he ordered them removed.

That in the spring before his death the testator rented to Jacob Burch two hundred acres of land at six dollars an acre, and within a few days thereafter the testator stated to Humphrey that his wife would not permit the land to "be plowed up," and for that reason the lease of the land fell through. That a short time prior thereto the testator volunteered to loan to said witness a sum of money on a farm he was buying, but when it came to the time to get the money he told the witness that his wife and William would not let him make the loan, consequently it fell through. He also stated that while he would like to make the loan, but rather than to have trouble in the family he would rather not make it. Also that he said that the only trouble he ever had was with the members of his family.

The plaintiffs' statement of the evidence regarding the facts attending the execution of the will is thus stated by counsel:

"Early in the afternoon of August 30, 1910, Mr. Linebaugh came alone in a buggy to a place in the public road, where T. J. Rogers, an aged justice of the peace, was mowing weeds. Mr. Rogers says, 'He told me he wanted me to write him a will; that he had concluded to change his will; that it didn't suit him in some respects.' This was Tuesday, and Mr. Linebaugh wanted it done on the next day, but Rogers told him that he could not go on Wednesday, but promised to go on Thursday. Mr. Linebaugh then suggested his two hired men as witnesses, but Rogers thought they would not do, and told him to get two others.

"On the next afternoon, in Clearmont, he called Mr. W. S. Wallace aside, and said to him, 'I want to have some writing done. I want to change my papers. We have known each other a long time, and

you know I am all right, and I want you to witness them. I am going to have Mr. Rogers come up tomorrow and write a will, and I want you to come up and witness it. I have some men up there working for me and I wanted them to sign it, and Mr. Rogers shook his head and said they wouldn't do because they were loose men and couldn't be found when they were wanted.' And then he said, 'It looked like a man ought to have the right to do as he pleased with his own property.' Mr. Wallace promised to go, and Mr. Linebaugh then sent word to Mr. Souers to come out as the other witness.

"On Saturday morning, at eight o'clock, Rogers arrived at the Linebaugh home to write the will. He was met at the door by Mrs. Linebaugh, and shown into the room where Uncle Jake was, and immediately began the writing of the will, and continued at that work until three o'clock in the afternoon. His story of that day's work fills twenty-nine pages of the abstract. We shall not burden this statement with even a synopsis of this remarkable story of this man, but want the court to weigh its every line. To us, it is a story past belief, and one which Rogers admits he thoroughly prepared himself to tell, before he came to court and it was manifestly overdone. Souers arrived at two o'clock, and Mr. Linebaugh met him at the door, telling him that he wanted him to witness the will because he was a good fellow. He was immediately seated, and Rogers kept writing on the will. Between thirty and forty minutes later, Wallace arrived, and Rogers was yet writing, and continued to write two or three minutes after that, writing two or three lines on the last page, probably the attestation clause. After Souers arrived, not a word was said about the contents of the will, and Mr. Linebaugh was in no manner informed, nor did he know what had been written therein, during the thirty or forty minutes that Rogers wrote after

Souers came. Rogers says that he could and probably did write the six lines and four words constituting the attestation clause in three minutes. No conversation of any kind was carried on by any of these three people during that half hour, Rogers busily writing all the time. Finally Rogers finished, and said, 'Well, here she is, Jake,' and Jake replied, 'I guess I will have to sign first,' and the will was signed and witnessed. The reason he gave Rogers for making the will the way he did, was that he wanted to keep the bigger portion of the estate in the name of the Linebaugh family.

"But little was seen of Mr. Linebaugh after the day, but Rogers went back two days later, and borrowed two hundred dollars from him. In thirty days he took to his bed, and died two weeks later; but just before his death, he requested his people to buy for him a lot in the cemetery, near to Janie, for he wanted to be buried as close to her as he could; and this they did.

"That some of the beneficiaries testified that:

"During the last sickness, Mrs. Linebaugh told the nurse, Mrs. Miller, 'That the old man's mind had not been right since Janie died. He had been an awful burden to her since that time. That he would often call her into the room where Janie's picture hung on the wall and he would stand and talk to the picture and cry like a child.' Mrs. Linebaugh denies making this statement.

"On the night before Mr. Linebaugh died, Jeff (William) talked to Alma Humphrey, and said to her 'that his mother had given him his notes [the $11,000 worth previously mentioned] and he had burned them up;' and, further, he said 'that his pa had not acted right since your mother's death. Since your ma told him goodbye, and said they will meet again, pa has not been right since.' Jeff denies this.

"On the night his father died, Jeff (William) followed Dr. Gaugh from the house, and asked him if he thought the fire had anything to do with his father's sickness. The doctor asked him why he asked that, and Jeff replied, 'Ever since the fire, father has been very nervous and hardly fit to do business.' Jeff denies this."

Counsel for defendants not having been satisfied with the abstract of the record as prepared by counsel for plaintiffs, have brought up and printed several hundred additional pages, which have in nowise been challenged by counsel for the opposition, consequently we must, under the rules of this court, take said additional abstract of the record as being true.

This additional abstract, taken in connection with that of the plaintiffs, presents a case for the defendants, as diametrically opposed to that of the plaintiffs as the north pole is from the south; and, but for the extreme length of the statement of the case, which would be caused thereby, I would set out the substance of the defendants' evidence, or at least the facts it tends to prove, but the volume of it prevents my so doing.

Consequently, in order to comply with the spirit, if not the letter of section 2088, Revised Statutes 1909, regarding the statement of a case, I will add that the evidence of the defendants was equally if not more voluminous than that of the plaintiffs and given by witnesses apparently as credible as those who testified for the plaintiffs. The effect of their testimony was a direct and positive contradiction of the plaintiffs' evidence upon all material issues involved in the case not admitted. In other words, the evidence of the defendants tended to prove that the testator, at the time of making the will, was possessed of a disposing mind and memory, in that he was capable of comprehending the nature, character and amount of all of the property he then owned; that

he fully comprehended and understood all of the persons who reasonably came within the range of his natural bounty; and that he was possessed of sufficient intelligence to understand his business and the disposition he was making of his property by the will in controversy.

I. From the foregoing statement of the case, which I believe is as fair for the plaintiffs as the record will warrant, in my opinion, it warranted a typical case for the jury.

**Will Contest: Case for Jury.**

If I correctly understand counsel for plaintiffs they do not contend that the court erred in submitting the case to the jury, under the evidence introduced, but do complain that the verdict is against the weight of the evidence, and that the court erred in rejecting evidence offered by plaintiffs, and in giving and refusing instructions to the jury.

Under the view of the case I am satisfied that the evidence presented a case for the jury, whether counsel for plaintiffs concedes it or not, and that the judgment of the circuit court should be affirmed without it erred in giving and refusing instructions or in receiving or rejecting evidence.

II. Counsel for plaintiffs complain of the action of the circuit court in excluding evidence offered by them, tending to prove that the feelings of the testator were hostile to and unfriendly to some one or more of the proponents of the will; and refer us to the rulings of the court as stated on page 66 of plaintiffs' abstract of the record. That page reads as follows:

**Will Contest: Evidence.**

"By Mr. Cook: I think it is a matter that goes to the conditions of the old man's mind.

"By the Court: I am just suggesting that to you gentlemen in the face of these decisions. Suppose you

got it now and the case was before the Supreme Court and you got it over their objection. Would your verdict stand there?

"By Mr. Cook: That is a matter we would have to take chances on.

"By the Court: Well, I am going to admit it, if you say so, and it won't affect me in any afterclap either. It is your fish-frying. In the first place, as I understand it, even these declarations for the purpose of showing the state of his affections with reference to these children must be the state of his affections with reference to these children that he didn't give anything to. Whether he hated or disliked the ones who are here wanting to sustain this will is immaterial to you, and to try to get evidence in here to show that he either hated or disliked one of the proponents and wanting to prove that by his hearsay statements to the witnesses is something that you can't do, it would seem to me, but you have looked this up carefully and are thoroughly prepared on it and I am going to defer to your judgment, but it does look to me like, in the face of—unless you have gotten fresher decisions, you oughtn't to do it.

"By Mr. Cook: Well, I will let it go with Uncle Isaiah.

"By the Court: Bring in the jury. I wouldn't risk it if I were you."

In our opinion the action of the court in excluding the evidence mentioned was proper for two reasons: first, because hard or ill feelings against the proponents of the will could in no manner show undue influence in their behalf, and against the plaintiffs. If it had any effect, which of course it did if it existed, it would have had the opposite effect from that contended for by the plaintiffs, namely, against the proponents and not in their favor; and, second, because the record quoted shows that the circuit court instead of excluding the evidence mentioned, admitted

it as requested by counsel for plaintiff, and warned them that in its judgment the court was committing error in their favor, and that they must suffer the consequences if it was error.

There is no merit in the complaint.

III. Plaintiffs or contestants next complain of the action of the trial court in not permitting them to show that certain of the legatees took no part in the case because they had been offered a certain sum of money for not joining in the contest of the will.

**Will Contest: Settlement with Disinherited Heirs.**

After a careful reading of all of the record bearing upon that question, we are fully satisfied that the offer, if made, was in the nature of a compromise of the case, and not, as bribery of witnesses. There is nothing disclosed by the record which smacks of bribery or an attempt to bribe, but all shows a desire to compromise the case and avoid family troubles, and keep out of court the sacred rights of family privacy, which are not only permissible, but encouraged and sanctioned by the laws of all the wisest governments.

There is no merit in this contention.

IV. The next complaint made by counsel for contestants is, that the instructions given by the court "to the jury for the proponents were misleading, voluminous and confusing; taken as a whole are one-sided, unfair and prejudicial."

**Will Contest: Instructions.**

Counsel do not undertake to point out or indicate in what manner the instructions given were misleading or unnecessarily lengthy, or did or could have confused the jury. The number and length of the instructions given of course depended largely upon the character of the case, the number of issues involved and the collateral matters injected into it.

After a careful reading of the instructions given for the proponents, in the light of the matters suggested, I have been unable to see in what manner they are susceptible to the criticisms suggested by counsel for contestants. While numerous, yet they are terse, clear and confined to the respective issues involved in the case, characteristic of the learned judge who gave them.

We are perfectly familiar with the cases cited by counsel for contestants supporting their position, namely, Heman v. Hartmen, 189 Mo. 1. c. 24, and Sidway v. Stock Company, 163 Mo. 1. c. 376, which announce a correct principle of law, yet by an examination of those cases it will be seen that they justly condemned the instructions given for the reasons complained of; but here no such reason has been suggested or pointed out.

This same question was presented to this court in the case of Crowl v. American Linseed Co., 255 Mo. 305, 1. c. 331, and we there said: "There can be no question but what an instruction may be so long drawn out, and deal with so many wholly unimportant matters, as to mislead and confuse the jury as to what are the real issues presented to them for determination. [Williams v. Ranson, 234 Mo. 1. c. 66; Still v. Railway Co., 236 Mo. 1. c. 398; Gardner v. Metropolitan St. Ry. Co., 223 Mo. 389, 417.] But unfortunately for the respondent counsel have not pointed out wherein this instruction is too long or wherein it was calculated to mislead or confuse the jury in that regard."

The same may be said of this case. Not only have counsel failed to point out the vices suggested regarding the instructions given in this case, but after a careful reading of them I have been unable to discover any of the evils the general complaint lodged against the instructions covers.

As was said in effect by Judge LAMM (the case in which it was said I have been unable to find) that when a complaint is lodged against an instruction given by the court, the complaining party should be required to point his finger to the particular error complained of, and that if he fails to so do then it is his and not the fault of the court should it fail to discover it, buried, perhaps, beneath a mass of evidence and issues, not so familiar to the judges of this court as to the learned counsel who tried the case below and who presented the same here.

Viewing the case from this angle I am of the opinion that there is no substance in this complaint, and that it should be and is ruled against the plaintiffs.

V. Counsel next complain of instruction numbered fourteen, given in this language (quoting from plaintiffs' brief):

"They [the jury] have no right to inquire into or speculate upon the motives which caused him [the testator] to dispose of his property as set forth in his will."

In the light of the evidence of this case, even though we should consider the excerpt above quoted from said instruction fourteen, as an abstract proposition of law, which under the rules of good practice should never be given, yet I am unable to see what practical harm could possibly have flown from this instruction in this case. But, however, that may have been, the instruction as given is not so abstract as the quotation above would indicate, which will be seen by reading it as a whole. I once heard a minister state from the pulpit: That if one should take only a part of the Bible in disconnected or isolated statements, and construe it alone, independent of their context, then he could show that the Bible authorized the doing of any and all things under the sun, and the prevention of the most innocent and

**Instructions.**

useful things to man. · He then gave a number of illus-
trations, most of which I have forgotten.   However, I
remember this one:   That according to said discon-
nected selection he could prove that it was sinful to
split rails, for the reason that the Bible said that what-
soever God had joined together let no man put asun-
der; therefore, God having produced the trees and
timber from which rails are made, no one had the right
to split or sever them.   But there, if my memory serves
me correctly, the Bible was speaking of marriage and
was enjoining man from separating man and wife.
This illustrates the point here presented by counsel
regarding said instruction numbered fourteen.

That instruction in full reads as follows:

"Unless the jury find from the evidence that Ja-
cob Linebaugh, at the time he made and executed the
will, was unduly influenced or coerced as those terms
are defined in these instructions, or was mentally in-
competent to make a will, then the jury have no right
to inquire into or speculate upon the motives which
caused him to dispose of his property as set forth in
the will; if he had the capacity to make a will and
was not unduly influenced in making it, he had the
right to dispose of his property in accordance with
any whim or caprice which may have led him."

It should also be borne in mind that this instruc-
tion was one of a series given, as indicated upon its
face, outlining the issues involved and guiding the
jury as to the degree of mentality the law requires of
a person in making a valid will.

With these facts in view it seems perfectly clear
to me that this instruction was intended to tell the
jury that if they believed and found from the evi-
dence that the testator, at the time of making the will,
was possessed of a sound mind and disposing memory,
as required by law, as stated in other instructions
given, then it was not the duty or province of the jury
to seek for and fish out some plausible or reasonable

excuse for giving the plaintiffs only $500 each, when he gave others, probably less deserving, much more. In other words, it told the jury that if the testator was of sound mind and acted independently, he had the absolute right to do as he pleased with his own, and that the jury, in such case, had no right to inquire of his motives when those facts were fully established in their minds.

The harshest criticism that could be plausibly lodged against this instruction is that it is a comment upon the evidence; but that objection was not made to the trial court, nor advanced here; consequently, if error in that regard, it is unavailing to plaintiffs.

Nor should it be overlooked that in other instructions the court had fully told the jury that all such apparent unnatural discrimination in the disposition of his property should be considered by them in passing upon the testamentary capacity of the testator, and whether or not undue influence was exerted over his mind.

This also I think was a comment upon the evidence which we will have occasion to consider later.

VI.   It is next insisted by counsel for contestants that the court committed reversible error in giving instruction numbered sixteen, which reads as follows:

"The court instructs the jury that the testimony of Mrs. Alma Humphrey and Mrs. Phoebe Miller and Doctor Gaugh introduced by plaintiffs regarding certain statements alleged to have been made to them by the witnesses William J. Linebaugh and Mary Ann Linebaugh was admitted by the court solely for the purpose of contradicting said witnesses, if it shall, in the opinion of the jury, tend to contradict them. But said testimony is not to be taken by the jury as any evidence whatever of the mental condition of the deceased, Jacob Linebaugh, or on the question of undue influence, or as to the truth of the facts stated."

The evidence at which this instruction was directed has been referred to in the statement of the case. In
**Instructions.** effect it tended to show, if anything, that the wife of the testator, and not he, gave the $11,000 worth of notes to William, the son; and that she told Mrs. Miller that the testator called her into the room where Janie's picture hung and she there found him talking to it.

Regarding the first matter mentioned, the evidence is so frivolous that no court or jury would or could give it serious consideration, and for that reason it is somewhat surprising that the trial court should have dignified it by mentioning it in the instruction; but be that as it may, it had no such probative force as could or should have influenced or changed the minds of the jury in reaching the verdict in the case.

We are, therefore, of the opinion that there was no reversible error in giving the instruction regarding that matter.

Regarding the other matter—the testimony of witnesses to the effect that the testator was talking to the picture of his daughter Janie, etc. This court has had occasion frequently to pass upon that class of evidence, and has invariably held the law to be as stated in the instruction under consideration. Such evidence is admissible, as stated in the instruction, for the purpose of contradicting the witnesses, in a proper case, and to show the state of the testator's feelings at the time it is alleged to have taken place, but as evidence of the truthfulness of the facts the witnesses testified the testator said and did at the time, is inadmissible.

The last case of this character which came before this court was that of Hayes v. Hayes, 242 Mo. 155, where Judge BOND refers to some of the cases upon the subject. And I might here add, the case of Schierbaum v. Schemme, 157 Mo. 1, l. c. 16, where Judge VALLIANT went quite extensively into the subject, which is worthy of anyone's time and talents to read.

There was no error in giving this instruction, limiting the testimony to its proper sphere; otherwise, the jury might have concluded that such testimony was evidence of the truthfulness of the facts about which the testator was speaking.

VII. It is also insisted by counsel for contestants that the court erred in giving instruction numbered seven, asked by the proponents regarding the soundness of the mind of the testator at the time of executing the will, and in refusing contestants' instruction numbered three as asked regarding the same subject, and in modifying it and giving in said modified form.

**Instructions.**

This matter can be better understood by setting out said instructions, which are as follows:

"The court instructs the jury that soundness of mind as used in these instructions means no more than the ability to know and comprehend what one is doing and the general character of one's property and the persons who reasonably come within the range of his bounty; and therefore if the jury believe from the evidence that Jacob Linebaugh signed the paper read in evidence as his last will, and that at the time of doing so he had sufficient mind and memory to know that he was disposing of his property by will, to whom he was giving it, and who came reasonably within the range of his bounty, and the general value, nature and character of his property, without the aid of any other person, then he was of sound mind; but by this is not meant that the testator must, at the time of execution of the will, be able without aid or assistance to recall each item of his property, or the governmental description of each tract and parcel of land which me may own, or the individual names of all of his debtors; but in that respect it is only required that he have a general, independent individual knowledge of these matters. And in this connection you are further instructed

that old age, physical weakness or imperfect memory caused by sickness or old age, or forgetfulness of the names or persons he has known, or the requiring of a repetition of information, will not be sufficient to establish incompetency or to invalidate the will, if he has sufficient intelligence remaining to fulfill the above definition.''

Contestants' refused instruction number 3. is as follows:

''The court instructs the jury that the burden of proof is upon the defendants to show that the paper writing, offered in evidence as the will of Jacob Linebaugh, was executed by the said Jacob Linebaugh as and for his will, and that at the time of the execution thereof he was of sound and disposing mind and memory; that is to say, the burden is upon the defendants to show to the jury by a preponderance of the evidence and to your satisfaction that at the very time Jacob Linebaugh signed the alleged will he had mind and memory enough to understand the ordinary affairs of life; the value, extent and nature of his property; the number and names of the persons who were the natural objects of his bounty; their deserts with reference to their conduct and treatment to him, and their capacity and necessity in life; and further, that at such time he had active memory enough to retain all these facts in his mind while the said will was prepared. And unless the defendants have proven to your satisfaction by a preponderance of the evidence that, at the time Jacob Linebaugh signed the alleged will, he had such a mind and memory, then your verdict should be against the will.''

The court of its own motion modified the foregoing instruction numbered 3, and gave it in the modified form as follows:

''The court instructs the jury that the burden of proof is upon the defendants to show that the paper

writing, offered in evidence as the will of Jacob Linebaugh, was executed by the said Jacob Linebaugh as and for his will, and that at the time of the execution thereof he was of sound and disposing mind and memory; that is to say, the burden is upon the defendants to show to the jury by a preponderance of the evidence and to your satisfaction that at the very time Jacob Linebaugh signed the alleged will he had mind and memory enough to understand that he was making a will disposing of all his property, to take effect at his death; the value, extent and nature of his property; the number and names of the persons who were the natural objects of his bounty, and his relations to them, and their situation in life; and further, that at such time he had active memory enough to retain all these facts in his mind while the said will was being framed. And unless the defendants have proven to your satisfaction by a preponderance of the evidence that, at the time Jacob Linebaugh signed the alleged will he had such a mind and memory, then your verdict should be against the alleged will."

We have carefully read all of these instructions and we are unable to find any conflict between them— all expressing the same ideas in different language— and all are in perfect harmony with the hundreds of adjudications of this court upon that subject, which are predicated upon the old case of Benoist v. Murrin, 58 Mo. 307, where it was by this court held, that one had a disposing mind and memory when he is capable of comprehending the character, nature and extent of his property, all of the names and persons who naturally come within the range or circle of his bounty, and the disposition he is making of his property.

If those cases are to be followed, then the ruling in this case must be that the trial court committed no error in giving the instructions complained of. In our opinion they properly presented the law of the case to the jury.

VIII. The next complaint of counsel for the plaintiffs is stated in that language:

"It was error to refuse plaintiffs' instruction number 7. Plaintiffs were unable to prove that Mrs. Linebaugh or Jeff were present in the room at the exact time the will was written. Jeff's whereabouts on that day will remain a mystery until the last day; and Rogers, with loyalty to his work, and having prepared his story, keeps Mrs. Linebaugh out of that room every minute of the day. To meet that condition, and that the jury might be properly informed as to the time when overt acts of undue influence might be performed, plaintiffs' counsel asked an instruction which is plain, concise and correct, properly advising the jury on that subject, number 7, as follows:

"The court instructs the jury that in order to find that the paper writing introduced in evidence as the will of Jacob Linebaugh is the result of undue influence of the defendants W. J. Linebaugh and Mary Linebaugh over the said Jacob Linebaugh, it is not necessary to find that any open and overt acts of undue influence were exercised at the exact time of the execution of alleged will, but it is sufficient if the jury find that such undue influence over the mind of Jacob Linebaugh had been previously acquired and did operate at the time of making the will in the disposition of the property of the said Jacob Linebaugh."

In my opinion this instruction correctly states an abstract proposition of law, but as I understand counsel and the record, there is not a scintilla of evidence upon which to base it except that indicated by counsel in presenting this proposition, namely: that plaintiff was not able to locate Jeff (William) and his mother while the will was being drawn, therefore, the court should have presumed they had performed their illegal work, unduly influencing the testator, before the scrivener arrived; and upon

Instructions.

that presumption the instruction under consideration should have been given.

In our opinion that is not the law, and the trial court properly, under the evidence in this case, refused to so instruct the jury.

But I have not answered all of counsel's complaints made under this head. They also complain that the trial court erroneously modified said instruction and in giving it in the modified form, by adding the following lines thereto:

"But in this connection the court instructs the jury that by the term 'undue influence' is not meant such influence as a wife may acquire over the husband by her general demeanor and conduct toward him, as his wife, through association with him. If by the evidence it appears that deceased's wife by long association with him, and by her treatment of him and her general demeanor towards him, gained his affections and absolute confidence, so that a desire to favor her in his will to the exclusion of all, or any one or more of his children or grandchildren, such an influence would not be an undue influence, and would not in itself furnish any ground whatever for impeaching the will, however unfair the jury may regard its provisions in that respect."

While I believe, as previously stated, that the court should have refused the instruction outright, yet since counsel asked it, and the court saw proper to modify and give it, I am led to believe that, perhaps, I may have overlooked some of the evidence bearing upon that subject, and for that reason I will consider it as given.

By reading the instruction it will be seen it in express terms is leveled at Mary Linebaugh, the wife of the testator, and William J. Linebaugh, his son, and thereby as I take it, the instruction was intended to be limited to them and their conduct alone.

That being true, then did the court err in telling the jury what were the true relations that existed between the testator and his wife and what influence she had the legal right to exercise over his mind in disposing of his property? This court has repeatedly held that it was proper to so instruct the jury.

Counsel for defendants thus state the law which meets with our hearty approval:

"In Defoe v. Defoe, 144 Mo. 458, the wife of testator was the principal beneficiary in his will. One of his sons and two minor grandchildren were the contestants. Undue influence was alleged and the evidence advanced in support of that allegation was that the mother had often spoken to testator of the bad habits of the son and referred to the subject in terms of harsh criticism; and evidence was given that another proponent, a son-in-law, had kept the testator posted as to what Frank (contestant) was doing, and had reported to him whenever Frank drank or gambled. Referring to such evidence the court says:

" 'It would be a sad commentary on family privilege and duty to say that a jury would be authorized to find that a mother had exercised an undue influence over the mind of her husband from the mere naked fact alone that in the presence of one of their sons-in-law she had joined with her husband in a word of warning to that son-in-law to be cautious how he signed notes for what they thought a reckless son, on account of his drinking and gambling habit or because in discussing the habits of that son, the mother in the presence of the father and son-in-law had criticized quite sharply the son's bad habits of drinking and gambling. . . . If such flimsy stuff is to be held and treated as evidence justifying a jury in defeating the will of a testator, on the ground that he had been unduly influenced in its making against the interest of what the testator thought a profligate son, then no

will that was ever made could withstand the assaults of a contest.' "

In Maddox v. Maddox, 114 Mo. l. c. 48, referring to the kindly visits of a son to his father's home, the court says:

" 'It would be a great reproach to the law, in its jealous watchfulness over the freedom of testamentary dispositions, if it should deprive age and infirmity of the kindly ministrations of affection, or of the power of rewarding those who bestow them.' We hope it will never be that the visits of a son to an aged and infirm parent, will be looked upon with suspicion and attributed to selfish motives.''

The same doctrine is announced by the authorities regarding a son or daughter, but as this instruction did not extend it to the son we will not discuss that question further. There is no merit in this contention.

IX. Counsel for contestants asked the following instruction which the court refused; and complaint is here made of that refusal:

"The court instructs the jury that while Jacob Linebaugh, if of sound and disposing mind and memory and free from undue influence, had the right to make such disposition of his estate among the natural objects of his bounty as to him seemed proper, yet you are further instructed that if you find from the evidence that by the proposed will he made an unequal distribution of his estate by giving substantially all to some of his heirs and substantially nothing to others; and if you further find from the evidence that there was, in fact, no substantial or reasonable cause for such unequal distribution of his estate, then in determining the questions of whether or not he was of sound mind and free from undue influence you may take into consideration the fact of such unequal distribution, if you find it to be a fact, as it may tend to show, or throw light upon, the question of his mental condition or

Andrew v. Linebaugh.

freedom from undue influence at the time the will was written; and in this connection you are instructed that in determining whether there existed any reasonable cause or reason for such unequal distribution of his estate, you may take into consideration, as may be shown by the evidence, the relations that existed between him and the natural objects of his bounty; his feelings and affections for them; their conduct and treatment of him; their condition and needs in life, together with his knowledge of such condition and needs.''

The numerous cases cited by counsel in support of the matters stated in this instruction are in perfect harmony with the views of this court as expressed in the case of Wendling v. Bowden, 252 Mo. 647. There we held that an unequal division of one's property, by will, among his children was a proper subject to be shown and commented upon before the jury. But that principle of law does not warrant the trial court to so instruct the jury. Such an instruction would clearly be a comment upon the evidence and thereby give undue prominence to those facts in discrimination of all others. While it is proper to show them, which was done in this case, and while they constitute legitimate grounds for argument before the jury, yet as just stated, it would be improper and erroneous for the court to comment upon them in the instructions. The reported cases show that such instructions have been quite frequently given, but so far as I have been able to discover no objections were lodged against them. Independently of this the other instructions given fully cover the points.

*Instructions.*

There was no error in the action of the court in refusing this instruction.

X. Counsel for contestants have presented one or two other minor points, but they are so closely allied to and dependent upon the propositions disposed

of, that they are thereby necessarily regulated to the resting places of their companions.

. Entertaining these views of the case, I am of the opinion that the trial court committed no error, and that the judgment thereof establishing the will should be affirmed; and it is so ordered. All concur in result.