ROBERT A. McNEALEY et al. v. LILLY L. MURDOCK, Appellant.

Division One, March 14, 1922.

1. **WILL CONTEST: Undue Influence: Testimony of Contestants: Interest in Result.** In a suit to contest a will on the ground that it was procured by undue influence of one of the beneficiaries who was the sole defendant, the fact that the contest, if successful, would result in diminishing the shares of the estate which some of the contestants were given under the will and in the equal distribution of the estate among all the heirs of the testatrix, is to be taken into consideration when considering their testimony in the case.

2. ————: ————: **Parent and Child.** Where the testatrix by her will disinherited several of her children and two grandchildren whom she had raised after the death of their father, her son, her free agency, in making such will, will be assumed unless there is

McNealey v. Murdock.

some evidence to the contrary; but in a suit to contest such will on the ground that it was procured by the undue influence of a daughter of the testatrix, one of the beneficiaries of it, the relation of parent and child and the natural love of a mother for her child are elements to be considered in inquiring into the question of whether she acted of her own free will or under the compelling influence of another.

3. ———: ———: **Action at Law: Verdict Based on Substantial Evidence Final.** The proceeding to contest a will is statutory and at law, and not in equity, and if there is substantial evidence to support the finding of the jury the judgment must stand unless the jury was improperly instructed by the trial court. And in this case the jury on the evidence, which is summarized in the opinion, were clearly within their right in finding for contestants

4. ———: ———: **Instructions: Discrimination and Inequality of Distribution: Comment on Evidence.** In a suit to contest a will on the ground that it was procured by the undue influence of one of the beneficiaries, a daughter of the testatrix, the will made a provision for two daughters and another for two sons, and then gave all the remaining property of testatrix in equal shares to these four children, and disinherited by name two other sons and a daughter and three grand children, children of a deceased son. All of the children and surviving grandchildren joined in this contest against the daughter by whose undue influence it was claimed the will was procured. The court instructed the jury on behalf of contestants that in making up their verdict they should consider the relationship of the beneficiaries to the testatrix; their condition in life, and the amount and value of the estate, and if they believed from the evidence that a discrimination was made in favor of one or more of the beneficiaries and that there was great inequality in the distribution of the estate and there was no explanation of such discrimination and inequality, then these facts should be considered by the jury in determining the issue submitted to them. And for the defendant the court instructed the jury that the mere fact that the testatrix in her will preferred one to another, that is to say, gave to one related in the same degree a smaller portion of her property than she gave to another, had no bearing on the validity of her voluntary act, nor was the testatrix, under such circumstances, called upon to assign reasons for making a distinction between several beneficiaries under her will, and the jury should not substitute its judgment for the testatrix's judgment, nor should they determine upon the wisdom or justice of the disposition made by the testatrix of her property, and whether such disposition was just or right was a question for

293 Mo. Sup.—2

the testatrix and for none other than the testatrix. *Held*, that, taken together, these instructions were not improper as a comment on the evidence, but that they were intended to and did tell the jury that if there was direct evidence tending to show that undue influence had been exercised over the testatrix in the execution of the will, then and then only, her discrimination between those apparently having equal claims upon her bounty might be considered as the result of such influence in the direct sequence of cause and effect, and not of her own free will, both of such elements together constituting the wrong.

5. ———: ———: ———: **Comment on Evidence.** The rule that it is improper for an instruction to single out certain portions of the evidence for special comment applies to the probative force and effect of such evidence, and not to the issue to which it is pertinent. The rule does not apply to an instruction in which the jury is simply told the particular issue to which the testimony is applicable, and the circumstances under which it may be considered as an element of such issue.

Appeal from Sullivan Circuit Court.—*Hon. V. L. Drain*, Judge.

AFFIRMED.

*John W. Clapp, Charles E. Murrell* and *Shelton & Shelton* for appellant.

(1)  Undue influence such as will justify the setting aside of a will, is such influence as amounts to over-persuasion, coercion, or force, destroying the will-power of the testator and substituting therefor the will of the actor. It is not merely the influence of affection, nor the desire of gratifying the wishes of one beloved or trusted by the testator. Such undue influence must not only exist, but it must be shown by affirmative proof to have been actually exercised by the actor at the very time the will was executed. Kibby v. Kamp, 154 Mo. 545; Hays v. Hays 242 Mo. 155; Turner v. Butler, 253 Mo. 202; Padgett v. Pence, 178 S. W. 205; Gibony v. Foster, 230 Mo. 106; Kleinlein v. Krauss, 209 S. W. 933; Lindsey v. Stephens, 229 Mo. 600; Dausman v. Rankin, 189 Mo. 677; Hahn v. Hammerstein, 272 Mo. 248; Teck-

enbrock v. McLaughlin, 209 Mo. 533. (2) Evidence that children consulted by testator concurred in his opinion that another child should be disinherited if he had said what had been attributed to him, is not evidence of undue influence; that is, of improper influence such as to destroy his free agency. Spencer v. Spencer, 221 S. W. 58. (3) Plaintiff's Instruction 5 is erroneous because it in effect and in fact does tell the jury that if the will of deceased shows any inequality in her bounty as among her children, or discriminates, and such inequality or discrimination is unexplained, their verdict should be to the effect that the will was not in fact the last will and testament of testatrix. Spencer v. Spencer, 221 S. W. 58; Andrew v. Linebaugh, 260 Mo. 662. (4) Discrimination in favor of one child over another is not of itself evidence of undue influence, but undue influence must be shown by other affirmative evidence. Where this is done it devolves upon the one alleged to have been the beneficiary of the undue influence to show that the will is the result of deliberation and spontaneity on the part of the testator, and not the result of any unholy or any undue influence on his part. Dausman v. Rankin, 189 Mo. 677. (5) The law is settled that unless there is substantial evidence upon which to bottom a verdict overturning the will, a finding to that effect cannot be maintained, and the will should be sustained. Webber v. Strobel, 236 Mo. 663; Hughes v. Rader, 183 Mo. 630; Tibbe v. Kamp, 154 Mo. 545; Jackson v. Hardin, 183 Mo. 185; Knapp v. Trust Co., 199 Mo. 640. (6) Any degree of influence over another, acquired by kindness and affection, can never constitute undue influence within the meaning of the law, and this principle applies in the case of a friend who has been made the beneficiary in a will, as well as in the case of a wife or child. Campbell v. Carlisle, 162 Mo. 634; Seibert v. Hatcher, 205 Mo. 83; Dausman v. Rankin, 189 Mo. 677. (7) The burden of proving undue influence rests upon the party attacking the will, the attack being predicated upon the charge of undue influence. Dausman v. Rankin, 189 Mo. 677; Morton v. Heidorn, 135 Mo. 608; Doherty v. Gillmore, 136 Mo. 414.

*Campbell & Ellison, Barker & Jones* and *Calfee &
Painter* for respondents.

(1) Appellant's demurrer to the evidence at the
close of plaintiffs' case was properly overruled. Mowry
v. Norman, 204 Mo. 173; Bradford v. Blossom, 190 Mo.
110; Roberts v. Bartlett, 190 Mo. 680; Gordon v. Burris,
153 Mo. 223. (2) Appellant's demurrer to the evidence
at the close of the whole case was properly overruled.
(3) No error was committed in giving respondents' In-
struction 5 as being a comment upon the testimony, and
in conflict with Instruction 6 for appellant. Bradford v.
Blossom, 190 Mo. 110; Dausman v. Rankin, 189 Mo. 677;
McFadin v. Catron, 120 Mo. 252; Gay v. Gillilan, 92 Mo.
250; 1 Redfield on Wills, 516, 537; Wendling v. Bowden,
252 Mo. 647; Gordon v. Burris, 153 Mo. 223; Turner v.
Anderson, 260 Mo. 1; Heinbach v. Heinbach, 274 Mo.
324; Moore v. McNulty, 164 Mo. 119.

BROWN, C.—This is a proceeding to contest an al-
leged will of one Virginia McNealey, who died in Sul-
livan County, where she had resided for many years, on
the second day of September, 1917, on the alleged ground
of undue influence exercised over her by her daughter,
Lilly Murdock, and her husband, Samuel L. Murdock,
the last named of whom died in 1911. The will purports
to have been executed in Sullivan County on the 23rd
day of September, 1904. Its disposing provisions are as
follows:

"Item First: I will, devise and bequeath to my
daughters, Lilly L. Murdock and Umatilla McNealey,
all my household and kitchen furniture, clothing and
household fixtures owned by me at my death, also 192
acres of land, lying and being in Sullivan County, Mis-
souri, to-wit: the south part of the east half of section
five, in township sixty-three, in range twenty, and the
east half of the southeast quarter of section thirty-two,
in township sixty-four, in range twenty, and the west half

of the southwest quarter of section thirty-three, township sixty-four, in range twenty, to have and to hold the same absolutely, share and share alike.

"Item Second: I will and devise to my sons, E. S. McNealey and R. A. McNealey, the following described land situated in Sullivan County, Missouri, to-wit: The north part of the east half of section five, township sixty-three, in range twenty, being about one hundred and thirty acres, also the northwest quarter of section four, and the west half of the northeast quarter of section four, and six and two-thirds acres of the north end of the west half of the southwest quarter of said section four, all in township sixty-three, in range twenty, to have and hold the same absolutely share alike, with the express understanding, however, that my son, R. A. McNealey, shall pay to his brother, E. S. McNealey, the sum of $600 to entitle him to share equally in said land, which I require of him for his misconduct towards me.

"Item Third: It is my will that all other property of every description, real, personal and mixed, that I may own and be possessed of at my death, not hereinbefore disposed of, shall go to and be divided equally between my children, Lilly L. Murdock and Umatilla McNealey, and sons, E. S. McNealey and R. A. McNealey.

"Item Four: I have heretofore made such provision for my children, J. H. McNealey, Mary N. J. Porter, George B. McNealey, and Virginia, Bulah and David E. McNealey, children of my deceased son, D. H. McNealey, as I deem sufficient and just, hence I give them nothing by this will."

Of the three grandchildren named in the fourth item, D. E. McNealey died before his grandmother.

The heirs at law of the purported testatrix excepting one, the daughter, Lilly Murdock, are plaintiffs, she alone being defendant. The only issue is whether or not the will is the product of undue influence exercised over the mind of Mrs. Virginia McNealey by her daughter, Mrs. Lilly Murdock, the defendant, or of her own free will. The executors named in the instrument were

the son, E. S. McNealey, and Samuel L. Murdock, the husband of the defendant. The latter died before the death of Mrs. McNealey, and E. S. McNealey was duly appointed executor of the will and is made a party in that capacity, as well as in the capacity of contestant.

The estate consists principally of seven hundred and thirty-two acres of farm land, and is valued at $60,000. It will therefore, be seen that the two sons and two daughters named in the first and second paragraphs of the will took nearly the entire estate, while the remaining two sons and one daughter, named Mary N. J. Porter, together with the two grandchildren, daughters of the deceased son, David H., were practically disinherited.

The one hundred and ninety-two acres of the land described in the first item of the will above quoted comprised the home farm on which Mrs. McNealey had lived for many years with her husband, who died in 1888. She owned the land in her own right, and not through her husband. She never remarried. Mrs. Lilly Murdock was her oldest child and, at the time of the execution of the will, was living with her husband, Samuel L. Murdock, about a mile and a quarter from her mother's home. Mrs. McNealey is shown by the evidence to have been an active, intelligent and strong-minded woman with little education. She could write her name, and signed all checks drawn on the First National Bank of Milan, with which she did her banking business, but never undertook to write one. Mr. Murdock, her son-in-law, was a man of some education, with an inclination toward legal pursuits. For nine or ten years preceding the execution of the will he had done business for Mrs. McNealey. He rented her farm during six of those years, and during the remainder of the time up to and after the execution of the will rented it to others, drawing the contracts therefor, and advised and assisted her in her business. He had law books in his house, and wrote contracts for his neighbors whenever called upon. He seems to have been a good business man, and to have sustained an excellent reputation. He had three sons and one daughter born of his marriage with defendant.

Mrs. Murdock knew of the execution of the will at the time. Her own cross-examination on that subject is convincing, as well as interesting. Her son, John Murdock, also testified for her. He was thirty years old at the time of the trial, and fifteen years old when the will was executed. He said that on the afternoon or evening of that day, Mrs. McNealey came to their house to bring back a horse she had borrowed to go to town, and came into the room where he and his father were seated, and said that she had been to town and fixed up her business, and that she also mentioned her will as the business she had fixed, and that his father said: ''I wouldn't have done that.''

Mr. Calfee testified that he wrote the will; that Mrs. McNealey came to his office in Milan on the date mentioned, with either one or two other women and a memorandum showing the description of the land and where it was to go. His memory was very indefinite, and while he knew Mrs. McNealey he did not know the other woman or women. He tried to make a legal will from the data given him by Mrs. McNealey, and his efforts resulted in the instrument mentioned, which he gave her for execution. Afterward she took it to the First National Bank where it was executed at a desk outside the counter, and Dr. Witter, her physician, and Mr. McCoy, the cashier of the bank, signed it as witnesses. Mr. McCoy died before the trial. Dr. Witter testified that he had a vague impression that there was another lady with testatrix, and that it must have been one of her daughters.

The defendant insisted at the trial that she had never heard of the execution of the will until it became a subject of conversation at the family home after the mother's funeral. Being driven from this position she admitted that her mother told her about five years after the date of its execution. Having been reminded of it by her son's testimony she admitted that she heard it from her son John at the time of or immediately after its execution. She also said that the day after the funeral she was called to a conference among the heirs as

to the division of the property equally; that at the time she had replied, in substance, that she would be willing to come into such an agreement if there should be no will, indicating that she did not yet know the fact of its execution. At the time or about the time of this conference both Ed and Robert, who were preferred devisees with her sister, testified, in substance, that she asked them if they were not going to stand by those who had stood by them when the will was made. This she denied. She admitted that after her mother's death she had opened a trunk which was so rickety that it did not require breaking, and had taken papers that were in the hands of her lawyer at the trial, and that among the papers taken from a bag at that time was an insurance policy which she, or her son for her, still retained. Her mother had been crippled by an injury received in a fall nearly a year before her death, and the evidence indicates that she was from that time in a critical condition. She was in Kirksville at the house of Robert, who had moved to that city, about two weeks before her death, and was about to go home. The defendant telephoned her that she would go with her the next day, but her mother did not wait for her, and the defendant immediately followed her to her home in Sullivan County, and the evidence indicates that she took charge of the house, and to use Umatilla's expressive description of what followed, ''Run her off.'' Robert, one of the two lucky brothers who were devisees in the will, testified that defendant told him in his mother's lifetime, in substance, that if he did not let matters alone she would have him cut out. It also appears that in a conversation between defendant and her mother, long after the execution of the will, the latter had suggested that her will should provide for an equal distribution of the property; that David's daughters, who had come to live with her after the father's death, should be provided for and that they were good girls. The defendant answered, in substance, that if she should change her will it would let down the bars and let in those whom she wanted to keep out. The foregoing

statement includes a few of the matters appearing in the testimony which we think bear upon the issue.

After the evidence was in, the court, among other instructions given for plaintiff, gave instruction number five, which is as follows:

"The jury are instructed that in making up their verdict in this case they should consider the relationship of the beneficiaries named in the paper read in evidence to the testatrix, Virginia McNealey; their condition in life and the amount and value of the estate of the testatrix; and if the jury believe from the evidence that a discrimination was made in favor of one or more of said beneficiaries, and that there is a great inequality in the distribution of the estate between the descendants of the testatrix, and there is not explanation of said discrimination and inequality, then these facts should be considered by the jury in determining the issue submitted to them in this case."

To the giving of which instruction the defendant objected and duly excepted.

The court then gave for defendant, among other instructions, number six, which is as follows:

"The court further declares that the law does not demand that a testator dispose of her property and distribute it equally among those who would be her heirs in the event she should die without a will; on the contrary, one who has property may dispose of it by will as to her shall seem meet and proper. The mere fact that in her will she prefers one to another, that is to say, gives to one related in the same degree a smaller portion of her property than she gives to another, has no bearing on the validity of her voluntary act, nor is the testator under such circumstances called upon to assign reasons for making a distinction between the several beneficiaries under her will. The jury should not substitute its judgment for the testator's judgment, nor should they determine upon the wisdom or the justice of the disposition made by the testator of her property; whether such disposition is just or right is a question for the testator and for none other than the testator."

The testimony will be further referred to as necessary.

I. It appears from the terms of the will, which we have already quoted, that the plaintiffs, Mrs. Kester, Ed S. McNealey and Robert A. McNealey, are not coming into the court with their hands extended asking for a larger share of their mother's estate than is given them by the terms of that instrument, but they bear in their hands an offer to their brothers, sisters and nieces who are co-plaintiffs with them, to remit so much of the shares they would take under the will as to make all the beneficiaries equal should the will be set aside to permit it. They reap no pecuniary advantage to themselves by their success, but are willing to meet the loss they would sustain in securing an equal distribution. Their sister, Mrs. Murdock, alone stands in the way. She is waging the conflict for her own pecuniary interest. We note this situation because the parties mentioned appear in the record as witnesses and their testimony must be considered in the light of their interest.

Relation of Parties.

While it is the right of every person in this State to make testamentary disposition of his or her property to whomsoever they will, and to disinherit any or all their natural heirs if it pleases them to do so, this right does not abrogate nor destroy the natural affection of a mother for her children. It is a law of nature which we cannot repeal, and which is, therefore, like the law of gravitation, an evidential fact in every issue involving its operation. As we assume that a ponderable body, when released from suspension, will fall to the earth, so we assume that a mother will love her child; and if at her death, she disinherits it, it sometimes becomes pertinent to inquire whether she does it of her own free will or under the compelling influence of another. Her free agency will be assumed unless there is some evidence to the contrary, but the relation of parent and child is always an element to be considered in the inquiry. The

statutory heir is often far removed in consanguinity and a perfect stranger, so that there would be no evidential force in the relationship. In fact his position as heir would have no foundation in natural affection, but would rest upon mere legal convenience.

In this case the disinherited ones were children with the exception of two grandchildren, who, upon the death of their father, her son, were taken to the home of their grandmother and reared to maturity. Long after the execution of this will she told the defendant, in effect, that she loved them; that they were good children; that she had raised them, and that it would be wrong to disinherit them. The only comfort or sympathy she received in reply was that they were not so good as her children, and that if she changed her will it would let down the bars to bring in those whom she desired to keep out.

II. The only issue is whether this will, disinheriting three children and two daughters of a deceased son, was made of her own free will or was the product of undue, that is improper, influence, exercised over her mind by the defendant, her oldest daughter. As this court has frequently held, this proceeding is statutory and at law, and not in equity, and if there was substantial evidence to support the finding of the jury the judgment must stand unless the jury was improperly instructed by the court. The first of these

**Undue Influence.** questions in natural order relates to the sufficiency of the evidence, of which we have given a brief synopsis in the introductory paragraph of this opinion. The theory of the plaintiffs is that on the day of the execution of the will, Mrs. Murdock took her mother to town, taking with them the memorandum from which it was drawn, went to the office of Mr. Calfee who took the memorandum, drew the will from it and gave it to Mrs. McNealey, who executed it. What became of Mrs. Murdock in the meantime is not suggested, and makes no difference.

The testimony is that on or about the same day, that is to say, the 23rd day of September, 1904, Robert Mc-Nealey was at his mother's home sometime in the morning. He testified that while with his mother, "Lilly blustered in and says, 'Ma, Sam and I are going to town to-day and we have thought it would be a good time to go down and make your will,' and I says, 'Lilly, if you thought half as much of ma as you ought to, you wouldn't be hounding her to death about her property,' and she says, 'You shut your mouth, or I will have you cut out.' " He then got a sack of salt and went out to salt a carload of cattle which he had in his mother's pasture awaiting shipment, and came back to the house at noon and found no one there; that he stayed around until about four o'clock and no one came. He then left, and John Murdock testified that on the same day Mrs. McNealey came to his father's house, about a mile and a quarter across the fields from her home, to bring a horse she had borrowed to go to town that day, and said to his father in his presence that she had been to town and fixed up her business, and mentioned her will as the business. He answered, "I wouldn't have done that."

This not only tends to prove that the will was made that day, but that Mrs. Murdock was the woman who accompanied Mrs. McNealey to Judge Calfee's office, and afterward to the place where the will was executed, but did not sign it as a witness, Dr. Witter being called instead; that on the same day the purpose of making the will was discussed between the two women at the home of Mrs. McNealey. If this be true it matters little whether the remark of Mrs. Murdock that if Robert "did not shut his mouth she would have him cut out," was jocular or serious. The fact is that in the memorandum in their possession at the time, a number of the descendants of Mrs. McNealey had been cut out, and that process was very naturally in her mind. The conversation between Mrs. McNealey and John Murdock on the same day also tends to prove that the matter of the will made on that day had been discussed between Mr. Murdock and Mrs.

McNealey, and that the former disapproved the disposi-
tions made in the memorandum and incorporated in the
will, although he, as the general business agent of his
mother-in-law, undoubtedly made it himself. We as-
sume that Mr. Murdock wrote the memorandum for the
reason that the evidence shows that Mrs. McNealey her-
self, who was unable to write her own checks, could not
have written it, although the defendant had testified that
she knew nothing of the execution of the will until the
death of her mother thirteen years afterward. When
confronted, in her cross-examination, with the testimony
of her son, she admitted that she learned the fact on
the day of its execution.

Fraud is a plant that will not flourish in the light.
It requires concealment of the truth for its nourishment.
It has, therefore, been frequently said that secrecy is a
badge of fraud. According to the admission of the de-
fendant under oath, she kept the facts of the execution
of this will free from those who she knew had been the
beneficiaries, as well as those who, in her own expressive
vernacular, had been "cut out," for almost thirteen years,
during which she was much with her mother, visiting
her frequently while living in Kirksville. In the Spring
of 1917, Mrs. McNealey's hip was injured by a fall and
her condition became serious. During the summer she
visited Robert, who had moved to Kirksville. The de-
fendant saw her there and, meeting Robert in the post-
office, said to him, "Ma looks awfully bad; she is not
going to live long;" and asked if he knew anything about
her making a will lately. Robert said jocularly "Yes,
she made a will and give it all to me," and she said, "I
am going over and stay till I get mine and I am going to
run the balance of them off." When her mother got
ready to go home she telephoned her to wait a day and
she would go with her. Mrs. McNealey paid no atten-
tion to this, but went as she had arranged, and defend-
ant, learning it, followed her the next day. We have al-
ready mentioned the fact that she did run Umatilla off
and took possession of her mother, who died about two

weeks afterward. It was during this time that the mother talked with her about making provision in her will for David's two girls, saying that if she made any difference between the children and these grandchildren in her will it should be in favor of the grandchildren, because she thought a lot of them when she took them to raise. Defendant answered she thought her children were better than those children. We think the evidence clearly shows that the defendant took it upon herself to watch her mother to the end, that she should make no change in the will already made. That it was her purpose, in following her from Kirksville, to take possession of the house and so demean herself as to exclude her sister Umatilla, so that there would be no interference with her plans. We think it also shows that the mother was considering the making of a will which would include all her children as well as the children of David, and that, had she been given the opportunity, this would have been done. It is admitted that after the death of her mother, and before an inventory and appraisement could be made, she took the papers of her mother from a trunk and bag which contained them; and under all the circumstances in evidence it is a fair inference which the jury might properly draw, that she did this to make sure that there was nothing in the house that could defeat her purpose to hold on to her preference under the will of 1904, which is here in question.

We think that the evidence, of which we have given a short synopsis of the leading features contained in more than four hundred pages of closely printed testimony, tends fairly to show as against this defendant that before the execution of the will she formed a design to induce her mother, by will, to disinherit other children as well as her grandchildren, for her benefit and the benefit of such brothers and sisters as she might deem it advisable to take into her plans. Her own proximity to her mother's home and the position of her husband as the mother's business agent and advisor, afforded the ground upon which to build. She obtained from her

husband a written memorandum containing the elaborate plan which has been embodied in this will, and took her mother to the office of a lawyer in Milan, who drew this will, and handed it to the testator for execution. Defendant and her mother then went to the First National Bank where they executed this instrument, the cashier signing as one of the witnesses, while they sent for Dr. Witter, whose office was in the same building, to get him to act as the other, the defendant being incompetent on account of her interest. They then drove home. The defendant carefully guarded the secret of the will from all the children and grandchildren until the death of the mother, thirteen years after its execution, put an end to the danger of revocation. During the mother's last sickness and when her death was imminent defendant followed the testatrix home with the declaration, in substance, that she intended to stay until she got hers, and so demeaned herself that her sister left her in sole possession of both house and mother. When the mother expressed her desire to provide by will for her granddaughters, whom she raised, and loved above all others, the defendant dissuaded her with the statement that it would only be letting down the bars to let in those she desired to keep out. The exact meaning of this is not explained, but as a proposition of law it was untrue. It was the duty of defendant when so called upon to tell her mother that she had the perfect right to make a new will bringing in whom she would and leaving out whom she would.

Under these circumstances the jury were clearly within their right in their finding for contestants. It follows that unless the jury were misled by plaintiffs' instruction number five their verdict must necessarily stand.

III. This instruction tells the jury that in making up their verdict, they should consider the relationship of the beneficiaries to the testatrix; their condition in life and the amounts and value of the estate, and if they

believe from the evidence that a discrimination was made in favor of one or more of the beneficiaries, and that there is a great inequality in the distribution of the estate, and if there is no explanation of said discrimination and inequality, then these facts should be considered by the jury in determining the issue submitted to them. In considering this rather complicated instruction it is necessary that we should analyze its directions in connection with instruction number six given for defendant. It is founded upon the well settled principle that the testator has the right to give his property to any one or more persons whom he may select as the beneficiary or beneficiaries of his will without giving a reason why. To ask an explanation would be equivalent to imposing a limitation on the right, by compelling the testator to lay bare the foibles of his own life as a condition for exercising it. The law makes the provisions of the Statute of Descents and Distributions subject to the general right of testamentary disposition, which is entirely unaffected by its terms. [Sec. 303, R. S. 1919.] It will be noted that this instruction nowhere intimates that the fact of discrimination between the children of testatrix unexplained is sufficient to authorize the jury to find a want of testamentary capacity in the testatrix, or that undue influence was used upon her with respect to such discrimination or otherwise. If it did so instruct the jury it was evidently erroneous upon the principle we have already stated. On the other hand, it clearly and carefully tells the jury that even before they are authorized to take the fact of discrimination into consideration at all upon the question whether or not undue influence had been exerted, they must find that discrimination was unexplained, and in such case they might take it into consideration in determining whether or not undue influence had been exerted upon the testatrix. There is no hint, however, in this instruction, that such unexplained discrimination could, standing alone, constitute evidence sufficient to support the charge of undue influence. It was also given in connection with an in-

struction requested by defendant which told the jury that "the mere fact that in her will she prefers one to another, that is to say, gives to one related in the same degree a smaller portion of her property than she gives to another, has no bearing on the validity of her voluntary act, nor is the testatrix under such circumstances called upon to assign reasons for making a distinction between the several beneficiaries under her will. The jury should not substitute its judgment for the testatrix's judgment, nor should they determine upon the wisdom or the justice of the disposition made by the testatrix of her property; whether such disposition is just or right is a question for the testatrix and for none other than the testator." This, it will be observed, expressly tells the jury that the discrimination shown in this case "has no bearing upon the validity of her voluntary act, nor is the testatrix under such circumstances called upon to assign reasons for making division between the several beneficiaries."

That the fact of discrimination constitutes the very foundation of this action is evident. Had each heir been given the same portion of the estate he would have been entitled to under the Statutes of Descents and Distributions, it is plain that no one of them would have had any cause of complaint, for the very evident reason that his remedy would be to have the will set aside, so that he would take under the terms of that statute. The discrimination, therefore, would be and is the primary evidential feature of such a proceeding. The fact must necessarily be in evidence and the question is directly presented as to the purpose or purposes for which the jury may consider it and its effect when so considered. It cannot be that the law requires the jury to be left in the dark upon a question which has agitated this court in numerous instances.

In Turner v. Anderson, 260 Mo. l. c. 31, this court said: "Mere inequalities in a will, therefore, do not impugn it, nor, standing alone, are they sufficient evidence of testamentary incapacity, when that is in issue, or

293 Mo.—3

undue influence, when that is in issue; but when there is other competent and substantial proof of testamentary incapacity or undue influence, then the rule is that unnatural or marked inequalities in a will, based on no reasonable ground, *are factors to be reckoned with on either issue in combination with other testimony.*" It implies that jurors are wiser than the court of which they form a part if it is improper to instruct them as to the purposes for which such testimony may be considered. There is, however, a rule that it is improper to single out certain portions of the testimony for special comment, but this rule applies to its probative force and effect, and not to the issue to which it is pertinent.

While many instructions of this character have passed the scrutiny of this court, their propriety has never been questioned so far as we have been able to find, until the point came before us in Andrew v. Linebaugh, 260 Mo. 623, in which it was said that such an instruction was a comment upon the evidence in that it singled out a particular class or item of evidence, as its subject. It was further said in that case that the question was not raised by a general objection to the instruction, such as was made in this case, but must be specifically stated in order to be available in this court. Even had the question been properly raised at the trial, it cannot apply to a case in which the jury is simply told the particular issue to which the testimony was applicable, and the circumstances under which it might be considered as an element in such issue. Those are pure and unadulterated questions of law, which it is the duty of the court to determine, and which the jury had no right to determine for themselves. In our opinion in the Andrew Case, we suggested that while such testimony was admissible in a case of this character, and was a proper matter of comment in argument, it was, when embodied in an instruction, simply a comment upon the evidence. If this was a proper interpretation of our language it would be pregnant with some queer results. For instance, were the principal issue, as in this case, undue

influence over the mind and will of the testatrix, and the
only testimony of such influence should be the evidence
of one whom the jury should consider a perjured wit-
ness, it might, without instruction to the contrary, con-
clude that the undue influence was well proven by the
discrimination of the testatrix among her children, and
find accordingly, and the court would be powerless to
correct such error for the reason that it would be ig-
norant of the ground on which the jury proceeded to its
verdict. The result of the failure of the court to instruct
upon the office to which such discrimination should be
confined, would work an absurdity which might be piti-
ful in its results. The law is that in such cases it is the
duty of the court to instruct the jury that in an issue
of this kind the office of such testimony is auxiliary only,
and can only be considered in connection with evidence
directly tending to show that undue influence was an
element in the concocting of the will. This was undoubt-
edly the theory upon which these two instructions were
given. They were intended to, and did tell the jury, that
if there was direct evidence tending to show that undue
influence had been exercised over the testatrix in the exe-
cution of the will, then and then only, her discrimination
between those apparently having equal claims upon her
bounty, might be considered as the result of such in-
fluence in the direct sequence of cause and effect, and not
of her own free will. Each of these elements is harm-
less in itself. It requires both to constitute the wrong.
When a cause is shown which may be either innocent or
harmful in its effect, and an effect is produced which
may spring from either an innocent or guilty cause, the
two must be combined to complete the legal wrong which
supports the action. This is the simple theory upon which
this class of instruction stands, and we think the two in-
structions, number five for the respondents and number
six for the appellant, clearly express it. Spencer v.
Spencer, 221 S. W. 58, is in direct line with this rea-
soning. In that case we held that there was no evidence
of undue influence, and that, therefore, discrimination

constituted no wrong, but was simply the exercise of the testator's legal right.

Finding no error in the record, we affirm the judgment of the Macon Circuit Court. *Ragland* and *Small*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by BROWN, C., is adopted as the opinion of the court. All of the judges concur, except *James T. Blair, J.*, not sitting.